Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| BANCO DE SANGRE DE SERVICIOS MUTUOS, INC.<br><br>Apelante<br><br><br>v.<br><br><br>UNIVERSAL INSURANCE COMPANY<br><br>Apelado | KLAN202400934 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso número: SJ2018CV08551<br><br>Sobre: Incumplimiento de Contrato de Seguro; Mala Fe y Daños y Perjuicios |

Panel integrado por su presidenta, la jueza Ortiz Flores, la juez Aldebol Mora y la jueza Boria Vizcarrondo.

Aldebol Mora, Juez Ponente

# SENTENCIA

En San Juan, Puerto Rico, a 12 de marzo de 2025.

Comparece la parte apelante, el Banco de Sangre de Servicios Mutuos, Inc., y nos solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, el 31 de julio de 2024, notificada al día siguiente. Mediante dicho dictamen, el foro primario declaró No Ha Lugar la demanda incoada por la parte apelante. En su consecuencia, desestimó el pleito con perjuicio.

Por los fundamentos que exponemos a continuación, se confirma el dictamen apelado.

## I

El 5 de octubre de 2018, el Banco de Sangre de Servicios Mutuos, Inc. (Banco de Sangre o apelante) incoó una *Demanda* sobre incumplimiento de contrato y daños y perjuicios en contra de Universal Insurance Company (Universal o apelado).[1] En particular,

---

[1] Apéndice del recurso, págs. 1-14.

indicó que Universal expidió la Póliza de Seguro Núm. 09-560-000532538-1 (Póliza) a su favor, la cual proveía una cubierta por interrupción de negocio, gastos extras, entre otros renglones. Alegó que, ante el paso de los huracanes Irma y María en septiembre de 2017, activó un plan de emergencia para garantizar el servicio continuo de sangre en los hospitales que suplía en Puerto Rico. Arguyó que, luego del paso del huracán Irma, se comunicó con un representante autorizado de Universal para auscultar si la compra de sangre en los Estados Unidos estaría cubierta como un gasto extra bajo la referida Póliza, cuya respuesta fue en la afirmativa. Señaló que, posteriormente, el paso del huracán María por la Isla interrumpió la operación normal del negocio y generó gastos extras. Indicó que, ante las pérdidas sufridas, las cuales estaban cubiertas por la Póliza, el 25 de septiembre de 2017, sometió una notificación de pérdida a Universal. Indicó que, en respuesta, Universal designó a un contable forense para la revisión de la reclamación por interrupción de negocio y gastos extras. Planteó que, luego de entregar la documentación correspondiente y someter una solicitud a esos efectos, recibió un adelanto de $100,000.00 aprobado por la contable forense, quien, a su vez, le indicó que no existía problema alguno con la compra de sangre en los Estados Unidos, ya que estaría cubierta por la Póliza.

El Banco de Sangre relató en la acción de epígrafe que, ante la mencionada afirmación de la contable forense, adquirió y extendió una línea de crédito para sufragar la compra de sangre en los Estados Unidos y, de esa forma, garantizar el servicio continuo de sangre a los más de cuarenta (40) hospitales que suplía. Argumentó que dicha compra se realizó para continuar operando porque las personas en Puerto Rico no estaban donando sangre. Expuso que, luego de varios sucesos, el 27 de febrero de 2018, Universal cursó una misiva mediante la cual informó que había cerrado su

reclamación sin justificación. Según adujo, el 8 de marzo de 2018, aún cerrada la reclamación, coordinó una reunión con un ajustador de McLarens International, así como un contable y ajustador de Universal, donde acordaron que se utilizaría $186.00 como el valor promedio de las pintas de sangre compradas en los Estados Unidos. Ello, para propósitos del cómputo a realizarse sobre los gastos extra a ser cubiertos por la Póliza. Alegó que, luego del ajuste de la reclamación, el 6 de junio de 2018, recibió una oferta formal de Universal en la cual se reconocían como cubiertas y se pagarían las siguientes partidas:

| CONCEPTO | VALOR |
|---|---|
| Daño Material | $4,300.00 |
| Business Income | $104,161.00 |
| Extra Expense Diesel | $150,000.00 |
| Extra Expense Compra de Sangre | $490,253.00 |
| Indemnización Neta | $748,714.00 |
| Adelanto | $100,000.00 |
| Saldo Indemnización | $648,714.00 |

En su escrito, el Banco de Sangre sostuvo que, de las partidas esbozadas, aceptó los valores asignados a: *Daño Material*, *Business Income* y *Extra Expense Diesel*. No obstante, arguyó que no estaba conforme con la indemnización que Universal propuso para la partida de *Extra Expense Compra de Sangre*, ya que la documentación sometida acreditaba que la compra de sangre, como gasto extra cubierto bajo la Póliza, ascendía a $1,240,000.00. Detalló que, el 9 de julio de 2018, envió su *Declaración de Pérdida* (*Proof of Loss*) a Universal, solicitándole el pago de las partidas de *Daño Material*, *Business Income* y *Extra Expense Diesel*, por no existir controversia en cuanto a estas, lo cual implicaba un pago inmediato de $258,461.00. Por otro lado, solicitó a Universal el pago de $1,240,000.00 por concepto de gastos extra en la compra de sangre. Alegó que, en respuesta, el 27 de agosto de 2018, Universal

se retractó mediante carta del ajuste realizado de su reclamación, retiró la oferta realizada, denegó la cubierta y determinó que lo único que cubriría serían los gastos extra relacionados con el local que operaba en la Avenida Ponce de León en Río Piedras. Añadió que, en dicha misiva, Universal indicó que solamente pagaría un total de $58,461.00, en vez de los $648,714.00 originalmente ofrecidos. Planteó que, ante las actuaciones de Universal, el 5 de octubre de 2018, radicó una *Querella* ante la Oficina del Comisionado de Seguros, por violaciones al Código de Seguros de Puerto Rico, Ley Núm. 77 de 19 de junio de 1957, según enmendada, 26 LPRA sec. 101 *et seq*. (Código de Seguros).

En virtud de lo anterior, el Banco de Sangre solicitó a Universal el pago de $1,398,461.00, más intereses, por concepto de incumplimiento contractual por las partidas reclamadas y no satisfechas en el *Proof of Loss*; $600,000.00, más intereses, por daños y perjuicios relacionados a la reducción de su capacidad económica ante el incumplimiento de la aseguradora; costas, gastos y honorarios de abogado(a).

Por su parte, el 12 de diciembre de 2018, Universal presentó su alegación responsiva.[2] En esencia, negó las alegaciones en su contra y arguyó que el Banco de Sangre había reclamado pérdidas que no estaban cubiertas por la Póliza en cuestión. En específico, alegó que la Póliza proveía cubierta de interrupción de negocio y gastos extraordinarios únicamente a la propiedad sita en la Avenida Ponce de León en Río Piedras, identificada como *Location 1, Building 1* en la Póliza. Planteó que el cierre de la reclamación el 27 de febrero de 2018 procedía por falta de documentación solicitada. Arguyó que, mediante dicha misiva, había informado que, una vez sometida la documentación pendiente, se continuaría con el trámite del reclamo.

---

[2] Apéndice del recurso, págs. 15-31.

De otro lado, negó que hubiera realizado una oferta de pago al Banco de Sangre el 6 de junio de 2018, así como los alegados términos de esta, y que luego se retractara, aunque afirmó que, el 9 de julio de 2018, recibió la comunicación del Banco de Sangre aceptando varias partidas y rechazando otras incluidas en la alegada oferta de pago. Argumentó que lo que el Banco de Sangre consideraba como una oferta de pago se trataba realmente de un documento preparado por su ajustador independiente para discusión interna. Sostuvo que existía controversia en cuanto a las pérdidas reclamadas por el Banco de Sangre y cubiertas por la Póliza. Afirmó que, el 9 de julio de 2018, realizó una oferta de pago por la cantidad de $158,461.00, conforme a los términos y condiciones de la Póliza. Según adujo, en todo momento actuó diligentemente, de buena fe y de conformidad con las cláusulas, términos, condiciones, endosos, limitaciones y deducibles de la Póliza. Negó que el Banco de Sangre sufriera daños y afirmó que lo reclamado por este era excesivo y no guardaba proporción con lo dispuesto en la Póliza.

Luego de varios trámites procesales y celebrada una vista evidenciaria, el 22 de mayo de 2019, notificada el 4 de junio del mismo año, el Tribunal de Primera Instancia emitió una *Sentencia Parcial Enmendada Nunc Pro Tunc.*[3] Concluyó que Universal, en efecto, realizó una oferta de ajuste final por partidas al Banco de Sangre el 24 de abril de 2018. Determinó que, una vez varias de esas partidas fueron aceptadas por el Banco de Sangre, se generó una obligación de pago. En vista de ello, resolvió que Universal debía pagarle al Banco de Sangre $158,461.00 como pago final de las partidas sobre *Daño Material*, *Business Income* y *Extra Expense*, previamente ajustadas por Universal y acordado entre las partes.

---

[3] Apéndice del recurso, págs. 32-52.

Posteriormente, el 26 de junio de 2020, Universal instó una *Moción de Sentencia Sumaria*.[4] En síntesis, alegó que no existía cubierta bajo la Póliza para la reclamación del Banco de Sangre sobre los gastos extraordinarios por la compra de sangre procesada fuera de Puerto Rico. Especificó que los hechos incontrovertidos demostraban que el Banco de Sangre no incurrió en el gasto extraordinario reclamado como consecuencia de los daños físicos causados a las propiedades aseguradas por el paso del huracán María. Según adujo, dicho gasto se produjo por riesgos no contemplados en el contrato de seguro, como la escasez de donantes en Puerto Rico, la cancelación de actividades de donación de sangre y la decisión gerencial de mantener cerradas las facilidades por falta de personal y/o donantes. En la alternativa, argumentó que el mencionado gasto extraordinario no cumplía con los requisitos establecidos en la Póliza para ser considerado como tal y que el Banco de Sangre no tuvo pérdida, lo que impedía recobrar bajo la Póliza. En vista de lo anterior, sostuvo que procedía la desestimación de la acción de epígrafe por la vía sumaria.

En desacuerdo, el 14 de agosto de 2020, el Banco de Sangre se opuso.[5] En esencia, arguyó que era un hecho incontrovertido que Universal había reconocido la existencia de la cubierta de *Extra Expense* cuando ofreció un pago de $150,000.00 por concepto de diésel y, posteriormente, fue obligada a satisfacerlo mediante *Sentencia Parcial*, lo que implicaba que dicha cubierta estaba disponible y constituía ley del caso. Adujo que, al escoger la opción de hacer una oferta de ajuste, la cual claramente incluía una partida de *Extra Expense* por compra de sangre, Universal no podía retractarse al alegar que no existía cubierta en la Póliza sobre ese

---

[4] Apéndice del recurso, págs. 74-99. Junto a su petitorio, Universal adjuntó prueba documental. Véase, Apéndice del recurso, págs. 100-405.
[5] Íd., págs. 406-435.

particular. Alegó, además, que Universal había realizado una oferta sobre ese renglón ascendente a $490,253.00, ajuste que no aceptó. Enfatizó que Universal tampoco podía obviar el acuerdo entre las partes de que el precio promedio de cada pinta de sangre comprada en los Estados Unidos era $186.00. Por tanto, sostuvo que no procedía la sentencia sumaria solicitada por alegada falta de cubierta para la compra de sangre.

Examinadas las posturas de las partes, el 6 de octubre de 2020, el foro *a quo* emitió y notificó una *Resolución* mediante la cual declaró No Ha Lugar la solicitud de sentencia sumaria presentada por Universal.[6] En particular, determinó que, en el ajuste realizado por Universal, este había valorado la compra de sangre en los Estados Unidos en $490,253.00, como parte del renglón de *Extra Expense,* por lo que la cubierta de esa partida estaba disponible y quedaba pendiente. Indicó que ello formó parte de lo resuelto en la *Sentencia Parcial Enmendada Nunc Pro Tunc* del 22 de mayo de 2019, la cual advino final y firme y, por consiguiente, constituía ley del caso. Es decir, coligió que Universal estaba impedido de alegar que dicha partida no estaba cubierta por la Póliza en cuestión. Por otro lado, el foro apelado señaló que persistían las siguientes controversias:

1. Determinar la cuant[í]a de aquellos daños que no se le han pagado a la parte demandante y que esta tiene derecho a que se le paguen.

2. Determinar si la propiedad asegurada sufrió el daño que la parte demandante le reclama a Universal y[,] si lo sufrió, está cubierto por la [P]óliza.

3. Determinar si Universal, realiz[ó] todos los trámites requeridos por el contrato de [P]óliza, cuando se le radic[ó] la reclamación por daños recibidos en la propiedad aquí asegurada y emitió su ajuste.

---

[6] Apéndice del recurso, págs. 436-454. Cabe destacar que, el 23 de noviembre de 2020, Universal acudió ante este Tribunal de Apelación y que, el 16 de diciembre de 2021, un panel hermano denegó la expedición del auto de *certiorari,* mediante *Resolución* final a esos efectos. Véase, Apéndice del recurso, págs. 468, 509-522.

4. Determinar si hubo mala fe de parte de Universal en el trámite de la reclamación realizada por la demandante.

Mediante *Orden* del 30 de noviembre de 2020,[7] el foro de origen autorizó a que el Banco de Sangre presentara el 30 de noviembre de 2020 una *Demanda Enmendada*,[8] a los únicos fines de atemperar la acción de epígrafe a las determinaciones de hechos y conclusiones de derecho de la *Sentencia Parcial Enmendada Nunc Pro Tunc* del 22 de mayo de 2019, así como reflejar el pago satisfecho por Universal. Por su parte, el 14 de diciembre de 2020, Universal acreditó su *Contestación a Demanda Enmendada*.[9]

El 31 de enero de 2022, el Banco de Sangre instó una *Solicitud de Sentencia Sumaria*.[10] Alegó que la única controversia que quedaba pendiente de adjudicación era determinar la cuantía de la partida de *Extra Expense* por la compra de sangre en los Estados Unidos, cubierta por la Póliza expedida por Universal, así como el interés legal correspondiente por mora. Asimismo, indicó que faltaba dilucidar lo relacionado al daño compensable como consecuencia del incumplimiento contractual y la mala fe de Universal en el manejo de su reclamación, al igual que el pago de honorarios de abogado(a) por temeridad. Argumentó que, al existir una cubierta para la reclamación de *Extra Expense* por la compra de sangre, procedía el dictamen sumario en cuanto a que la responsabilidad de pago de Universal por dicha partida nunca sería menor de $490,253.00. No obstante, aclaró que la cuantía total de compensación por la antedicha partida, en exceso, sería objeto de la vista en su fondo.

---

[7] Entrada Núm. 101 del Caso Núm. SJ2018CV08551 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).

[8] Apéndice del recurso, págs. 469-484.

[9] Íd., págs. 485-504.

[10] Entrada Núm. 121 del Caso Núm. SJ2018CV08551 en el SUMAC.

En respuesta, el 11 de marzo de 2022, Universal se opuso.[11] En síntesis, planteó que, de los dictámenes previos del tribunal surgía que, la cuantía de daños a la que –en su día– tendría derecho el Banco de Sangre estaba en controversia y debía dirimirse en un juicio. Arguyó que lo solicitado por el Banco de Sangre no estaba debidamente sustentado en Derecho, toda vez que, cuando existía controversia sobre alguna partida objeto de una reclamación de seguros, procedía que esta se dirimiera en los méritos mediante juicio plenario. En virtud de lo anterior, sostuvo que procedía que se declarara No Ha Lugar la *Solicitud de Sentencia Sumaria* presentada por el Banco de Sangre.

Atendidos los planteamientos de las partes, el 7 de junio de 2022, el foro sentenciador emitió y notificó una *Resolución* en la cual declaró No Ha Lugar el petitorio sumario incoado por el Banco de Sangre, por existir hechos esenciales en controversia y por incumplir con lo requerido por la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.[12] El foro primario destacó que aún persistían los hechos materiales en controversia enumerados en la *Resolución* del 6 de octubre de 2020. En particular, expresó que, en esa etapa de los procedimientos, no estaba en posición de concluir que el pago de la partida de *Extra Expense* por la compra de sangre en los Estados Unidos no debía ser menor de $490,253.00, pues existían hechos materiales en controversia.

Así las cosas, el 18 de enero de 2024, el Banco de Sangre y Universal presentaron una *Moción Informativa Conjunta.* [13] Informaron que Universal realizó un pago de $490,253.00 al Banco de Sangre, correspondiente al ajuste y oferta de la reclamación de gastos adicionales por la compra de sangre importada. Ello, bajo la

---

[11] Entrada Núm. 134 del Caso Núm. SJ2018CV08551 en el SUMAC. En apoyo a su contención, Universal acompañó su oposición con prueba documental.
[12] Entrada Núm. 144 del Caso Núm. SJ2018CV08551 en el SUMAC.
[13] Apéndice del recurso, págs. 1789-1791.

cubierta *Business Income & Extra Expense* de la Póliza en cuestión. No obstante, plantearon que Universal sostenía su postura de que el Banco de Sangre no tenía derecho a una cuantía adicional, mientras que este último argumentaba que la reclamación asegurada por Universal excedía la citada cuantía pagada en adelanto.

Celebrado el juicio en su fondo,[14] y evaluadas las posturas de las partes, el 31 de julio de 2024, notificada al día siguiente, el Tribunal de Primera Instancia emitió la *Sentencia* que nos ocupa, mediante la cual declaró No Ha Lugar la *Demanda* incoada por el Banco de Sangre y ordenó la desestimación del pleito con perjuicio.[15] En particular, el foro apelado desglosó las siguientes determinaciones de hechos:

1. El Banco es una corporación doméstica con fines de lucro registrada en el Departamento de Estado con el número 45598, la cual se dedica a la recolección de la sangre donada, el procesamiento de la sangre donada, de manera que esté lista para transfusión y la venta de la sangre lista para transfusión a hospitales, con los cuales mantiene contrato para suplido de sangre.
2. El Sr. José Alsina Cardona ("Sr. Alsina") comenzó a trabajar en el Banco de Sangre de Servicios Mutuos, Inc. ("Banco") en el 2003 como representante de servicios. Ha laborado en todas las áreas del Banco y ha adquirido conocimiento de la operación completa.
3. Desde el 2009 hasta el presente, el Sr. Alsina ha fungido como [v]icepresidente y [p]rincipal [o]ficial de [o]peraciones ("COO"), y como tal, maneja los aspectos corporativos del negocio, los contratos del Banco[,] con alrededor de 40 hospitales de Puerto Rico a los cuales le distribuyen sangre y sus componentes, las pólizas de seguros del Banco, la salud financiera del negocio, la coordinación interdepartamental, entre otros.
4. El Banco está compuesto de varios departamentos, incluyendo el del Director Médico, Calidad, Reclutamiento, Colección, Manufactura y Distribución, Recursos Humanos, Finanzas y Revisión de Récords.
5. El Banco es el principal vendedor de sangre y componentes sanguíneos (células rojas, plasma y plaquetas) en Puerto Rico y se nutre principalmente de la manufactura y distribución de sangre donada localmente.

---

[14] Apéndice del recurso, págs. 1862-1873. Véase, además, la Entrada Núm. 213 del Caso Núm. SJ2018CV08551 en el SUMAC.
[15] Íd., págs. 1874-1903.

6. Para el 20 de septiembre de 2017[,] el Banco operaba centros de donación de sangre en los cinco (5) locales identificados en la póliza comercial número 09-560-000532538-1000, donde recolecta sangre donada por particulares que acuden a sus facilidades. El Banco cuenta con dos (2) centros de colección adicionales y también realiza actividades especiales de recolección fuera de sus centros de donación.

7. La sangre donada localmente es aquella que se extrae de los donantes que acuden a los centros de colección del Banco en Puerto Rico o que participan de eventos de donación de sangre, conocidos como "sangrías" (*blood drives*).

8. La sangre donada no es otra cosa que materia prima que, una vez se extrae mediante el proceso de flebotomía, atraviesa un proceso de manufactura regulado por la Administración de Alimentos y Medicamentos de los Estados .....Unidos ("FDA"[,] por sus siglas en inglés) y se prepara para la venta.

9. El Departamento de Reclutamiento del Banco está a cargo de reclutar donantes de sangre en Puerto Rico, contacta aquellos donantes que surgen de los récords de inscripción de donantes del Banco, y coordina eventos de donación (*blood drives*).

10. El Departamento de Colección del Banco cuenta con 40 enfermeros(as) quienes se encargan de realizar el proceso de flebotomía mediante el cual se realiza la extracción de sangre en los donantes.

11. El Departamento de Revisión de Récords del Banco verifica la documentación de cada donante y certifica que la documentación está completa previo a que la sangre donada se entregue al Departamento de Manufactura.

12. El Departamento de Manufactura del Banco recibe cada pinta de sangre donada y envía parte de esta a laboratorios en Estados Unidos para que se le realicen los análisis correspondientes para determinar el tipo de sangre, descartar enfermedades virales, entre otros, según requiere la FDA.

13. Luego de validar los resultados de las pruebas que se realizan en Estados Unidos, el Departamento de Manufactura comienza el proceso de manufactura, lo que incluye la centrifugación de la sangre en distintas etapas para separar sus componentes, obtener Leucoreducido (LRBC) eliminando los glóbulos blancos, manufacturar y almacenar el plasma y plaquetas y, dependiendo de la necesidad del paciente, manufacturar el crioprecipitado.

14. El proceso de manufactura de la sangre donada también requiere procedimientos regulados de clasificación, empaque y etiquetado. En total, el proceso de manufactura de una pinta de sangre donada tarda ocho (8) horas desde que la sangre es colectada.

15. De la pinta de sangre donada el Banco manufactura cuatro (4) productos (células rojas, plasma, plaqueta y crioprecipitado) para la venta.

16. Durante la etapa de reclamación ante Universal[,] y en todo este litigio, el Banco representó que normalmente incurre en un costo de producción de $122.12 por cada

pinta de sangre donada localmente en Puerto Rico, que incluye costos directos e indirectos.

17. Entre las instancias en que el Banco representó a Universal que el costo de producción por pinta donada es de $122.12 se encuentran: (1) el 9 de marzo de 2018, cuando, en respuesta a la solicitud de Universal, produjo esa información; (2) el 9 de julio de 2018, en la carta de sus abogados acompañando un *Proof of Loss* bajo juramento; (3) en la deposición del Sr. Alsina con la que fue confrontado; y (4) en el Informe del CPA Fernández Pelegrina.

18. Además, en todas estas instancias se explicaba que estos costos de producción no fueron incurridos en las pintas de sangre importadas.

19. Los costos directos son aquellos que incluyen materiales para colección, reclutamiento de donantes y componentes, pruebas y nómina relacionada con los servicios de reclutamiento de donantes, recolección, manufactura y etiquetado (*labeling*). Los costos indirectos son tanto fijos como variables e incluyen utilidades, mantenimiento, disposición de desperdicios y transporte.

20. La producción de sangre es cíclica. Hay épocas del año, como los meses de julio y diciembre, en que las donaciones de sangre que recibe el Banco disminuyen, lo que provoca una disminución en el inventario de sangre.

21. Como parte de la operación regular del Banco, [e]ste importa de [los] Estados Unidos sangre lista para transfusión para abastecer su inventario.

22. En el 2014, el Banco importó 5,663 pintas de sangre. En el 2015, importó 669 pintas de sangre. En el 2016, importó 7,760 pintas de sangre debido al impacto del Zika en la colección y manufactura de sangre donada en Puerto Rico.

23. En los años 2014 y 2015 no hubo huracanes o Zika, pero el Banco compró pintas en Estados Unidos para abastecer su inventario.

24. La meta del Banco es no recurrir a la importación de sangre, pero lo hace cuando su inventario disminuye significativamente por cualquier razón.

25. El promedio mensual de colección de sangre del Banco en los meses de enero a agosto de 2017 fue de 4,620 pintas.

26. El promedio mensual de importación del Banco de pintas de sangre desde los Estados Unidos en los meses de enero a agosto de 2017 fue de 1,376 pintas.

27. El [h]uracán María pasó por Puerto Rico el 20 de septiembre de 2017.

28. Tras el paso del referido evento, hubo una merma de donaciones de sangre y el Banco tuvo que importar sangre de Estados Unidos para abastecer su inventario y poder suplir el producto a los hospitales con quien mantenía contratos, mitigando su pérdida de ingresos durante el periodo de la pérdida.

29. La sangre adquirida por el Banco fuera de Puerto Rico estaba lista para transfundirse.

30. El Banco no incurrió en los costos de producción (reclutamiento, colección, manufactura) para las pintas de sangre importadas.

31. El 25 de septiembre de 2017, el Banco sometió a Universal, por conducto del Sr. José Montalvo Calderón, una notificación de pérdida por motivo del huracán María, utilizando un formulario preimpreso de Universal[,] titulado *"Property Loss Notice"*.

32. Junto con el productor de seguros del Banco, José Montalvo Calderón, el Sr. Alsina estuvo a cargo de gestionar la reclamación que el Banco le sometió a Universal bajo la Póliza por las pérdidas sostenidas como consecuencia del paso del [h]uracán María por Puerto Rico.

33. Además, el Sr. Alfredo Peña, contador y empleado del Banco por los pasados 10 años, estuvo a cargo de la preparación y revisión de toda la documentación financiera que el Banco le proveyó a Universal durante el proceso de ajuste de la reclamación y como parte del descubrimiento de prueba en este caso para sustentar el Extra Expense reclamado por la compra de sangre en [los] Estados Unidos.

34. Todos los cálculos y documentos que reflejaron las pérdidas reclamadas a Universal que preparó el Sr. Peña fueron revisados y aprobados por el Sr. Alsina.

35. En todo momento relevante a la presente acción, el Sr. Alfredo Peña ha estado a cargo del manejo de las finanzas y contabilidad del Banco y de asesorar al Sr. Alsina en la toma de decisiones financieras del negocio.

36. La partida más significativa de la reclamación del Banco a Universal, bajo la póliza de seguro, fue la partida de compra de sangre fuera de Puerto Rico.

37. Por su parte, Universal encomendó la investigación y el ajuste de la reclamación del Banco a la firma de ajustadores independientes McLarens International.

38. El Banco sometió a un ajustador de McLarens International la evidencia sobre la compra de sangre que tuvo que realizar en los Estados Unidos necesarias para suplir la necesidad de los hospitales.

39. El 8 de marzo de 2018 se celebró una reunión entre los ajustadores de McLarens International, Danilo Andrés González y Carlos Jiménez, la contable Margarita Rivera (consultora de los ajustadores de Universal), el Sr. José Montalvo Calderón y el Sr. José Alsina Cardona, [v]ice-[p]residente y [p]rincipal [o]ficial de [o]peraciones (COO) del Banco, donde se acordó que se atribuiría el precio promedio de $186.00 como valor de cada pinta de sangre comprada en los Estados Unidos.

40. En la reunión del 8 de marzo de 2018, se le comunicó al Banco que había que considerar los costos de producción normales para propósito del cálculo de *Extra Expense*. Al día siguiente, se produjo la información, de la cual surgía que dichos costos ascienden a $122.12 por pinta.

41. Universal continuó atendiendo la reclamación del Banco luego de la reunión del 8 de marzo de 2018.

42. El Banco, por conducto de sus abogados, escribió una carta el 9 de julio de 2018, solicitando de Universal el pago de las partidas en la oferta que había acuerdo, las cuales eran "daño material["]", "business income" y "extra expense" para Diesel, por las sumas de $4,300.00,

$104,161.00 y $150,000.00 respectivamente, lo que implicaba un pago por $258,461.00.

43. Para esta fecha[,] el Banco contaba con el asesoramiento de su corredor de seguros, su contador de confianza, abogados que los representaban y con la experiencia y vasto conocimiento del negocio del Sr. Alsina.

44. A la carta del 9 de julio de 2018 que el Banco le remitió a Universal[,] se anejó un documento titulado *Proof of Loss* firmado bajo juramento por el Sr. Alsina, y que incluye como *Attachment A* una tabla preparada por el Sr. Alfredo Peña, revisada por el Sr. Alsina y los representantes del Banco, de la cual surgen los costos fijos, variables y de producción solicitados por Universal.

45. En el *Attachment A* del *Proof of Loss* el Banco incluyó la siguiente tabla respecto a los costos de producción por pinta de sangre que fueron solicitados por Universal:

| MATERIALS | | |
|---|---|---|
| Collection Material | $ 34.17 | $ 34.17 |
| Recruitment Material | 3.67 | 3.67 |
| Component Material | 3.85 | 3.85 |
| **TOTAL COST OF MATERIALS** | **$ 41.69** | |
| | | |
| **TESTING** | **49.50** | **49.50** |
| | | |
| **LABOR COSTS** | | |
| Recruitment | 0.50 | 0.50 |
| Collection | 5.17 | |
| Manufacturing | 3.88 | |
| Labelling | 0.21 | 0.21 |
| **TOTAL COST OF LABOR** | $   9.05 | |
| | | |
| **OVERHEAD COSTS** | | |
| *Fixed Cost | 16.11 | |
| **Variable Cost | 5.78 | 5.78 |
| **TOTAL OVERHEAD COST** | **$ 21.88** | |
| | | |
| **TOTAL COST** | **$122.12** (general value per pint related to blood donations in PR) | **$ 97.68** |

46. El Sr. Alsina admitió durante su contrainterrogatorio que[,] luego del [h]uracán María[,] el Banco no incurrió en los costos de producción ascendentes a $122.12 por pinta.

47. Universal realizó el ajuste del *Extra Expense* por la compra de sangre importada[,] tomando en consideración las disposiciones de la Póliza y la información provista por el Banco, incluyendo la cantidad de 7,665 pintas a un precio promedio de $186.00 cada una y los costos fijos, variables y de producción, a razón de $122.12 por pinta, que luego se incluyeron en el *Attachment A* del *Proof of Loss.*

48. La forma CP 00 30 10 12 (*Business Income (and Extra Expense) Coverage Form*) está incluida en la póliza comercial número 09-560-000532538-1/000 que Universal expidió a favor del Banco de Sangre y define gastos adicionales o *extra expense* como "*necessary expenses you incur during the 'period of restoration' that*

*you would not have incurred if there had been no direct physical loss or damage to property cause by or resulting from a Covered Cause of Loss.*"

49. Según la cláusula de *Loss Determination* de la forma CP 00 30 10 12, la cantidad del *Extra Expense* se determinará a base de: "*(1)* **All expenses that <u>exceed</u> the normal Operating expenses that would have been incurred by [']operations['] during the [']period of restoration[']** *if no direct physical loss or damage had occurred…; and (2) Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.*"

50. Los gastos operacionales del negocio, tal y como renta, utilidades y nómina son gastos ordinarios que continuaron durante y después del periodo de restauración y que se atienden bajo la cubierta de *Business Income* de la Póliza, que no está en controversia.

51. El Banco produjo a Universal un documento titulado "Unidades Vendidas de RBC" para los años 2014 al 2019, admitido como Exhibit 1 de la [p]arte [d]emandada, que demuestra que el Banco vendió 20,895 unidades (pintas) de sangre (RBC) durante el periodo de la pérdida, del 20 de septiembre de 2017 a 31 de enero de 2018, por un total de ingresos de $4,288,198, que, dividido entre el número de unidades (pintas) vendidas, arroja un precio promedio de venta de $205.22 por pinta de sangre.

52. Cuando al precio promedio de venta de $205.22 por pinta de sangre se le resta el costo promedio de $186.00 por cada pinta de sangre importada que el Banco pagó por las que compró en [los] Estados Unidos después del [h]uracán María hasta el 31 de enero de 2018, el total refleja la cuantía de $19.22.

53. Cuando al precio promedio de venta de $205.22 por pinta de sangre se le resta el total de $122.12 de costos de producción el total representa la ganancia ordinaria del Banco por la cantidad de $83.10.

54. El gasto extra incurrido por el Banco en las pintas importadas es de $63.88, según el ajuste de Universal, y surge que esa es precisamente la diferencia entre la ganancia de una pinta donada ($83.10) y una pinta importada ($19.22).

55. La cantidad de $63.88 por pinta representan el gasto **extra** incurrido por el Banco en las pintas importadas en comparación con las donadas.

56. El pago de $63.88 por pinta de sangre ponía al Banco en la misma posición en que hubiese estado de no haber tenido que importar.

57. Ese gasto extra ($63.88) al multiplicarse por el total de pintas importadas como resultado del [h]uracán María (7,665) da como resultado la cuantía de $489,640.20 que es un poco menor que la cantidad ($490,253) que Universal ofreció al Banco desde el 24 de abril de 2018.

58. El 11 de enero de 2024, Universal pagó al Banco la cantidad de $490,253[,] a base del ajuste realizado por el reclamo de *Extra Expense*.

59. El 11 de diciembre de 2019, el Banco contrató al CPA Alberto Fernández Pelegrina como su perito con el propósito de calcular la pérdida de *Extra Expense* por

compra de sangre en los Estados Unidos que sostuvo el Banco como consecuencia del [h]uracán María.

60. El CPA Fernández Pelegrina no estuvo de acuerdo con el ajuste que hizo Universal sobre el reclamo de pérdida de ingreso o *Business Income* ("BI") por la cantidad de $104,161.11[,] aceptada por el Banco y sobre la cual no existe controversia.

61. El CPA Fernández Pelegrina se basó en la documentación financiera del Banco que preparó el Sr. Peña para computar los intereses que reclama el Banco.

62. El CPA Fernández Pelegrina admitió que[,] para sus cálculos[,] utilizó gastos operacionales que continuaron pasado ya el periodo de restauración y que, bajo la póliza, eran compensables bajo la cubierta de *Business Income*, la cual no está en controversia.

63. El CPA Fernández Pelegrina admitió en su informe del 18 de noviembre de 2020 que no era un experto ni proveyó opiniones de cubierta en su informe.

64. Entre estos gastos operacionales[,] considerados por el CPA Fernández Pelegrina[,] se encuentran: nómina, contribuciones, beneficios marginales, seguros, agua, luz, teléfono y renta.

65. El CPA Luis O. Carranza fue contratado como perito de Universal para propósito de calcular el *Extra Expense* por compra de sangre en los Estados Unidos que sostuvo el Banco de Sangre, y, aunque no reveló su cómputo, declaró que fue menor al ajuste de Universal.

66. El CPA Carranza declaró que[,] al hacer el cómputo - menor al ajuste de Universal-[,] descansó en la prueba relativa al cálculo del costo de producción que realizó el *Comptroller* del Banco, Sr. Alfredo Peña, ascendente a $122.12 por pinta manufacturada.

67. El CPA Carranza también aclaró que su cálculo es uno rutinario y no requiere de un contador forense para realizarlo.

68. Ambos peritos tomaron como cierta y sin reserva alguna (*at face value*) la información provista por el Banco de Sangre en torno a los costos de producción de una pinta de sangre donada y manufacturada, incluyendo el total de $122.12. (Citas omitidas).[16]

Luego de interpretar las cláusulas en controversia de la Póliza en cuestión, el foro primario concluyó que la cantidad del gasto adicional que Universal venía obligado a indemnizar se determinaba a base del exceso en gastos normales que, por causa del paso del huracán María el 20 de septiembre de 2017, el Banco de Sangre tuvo que incurrir y del gasto necesario para reducir la pérdida de ingresos del negocio. Indicó que no había controversia en que el *Extra Expense* por la compra de sangre estaba cubierto bajo la Póliza; que,

---

[16] Apéndice del recurso, págs. 1884-1892.

el 8 de marzo de 2018, los representantes de las partes se reunieron y acordaron atribuirle un costo unitario promedio de $186.00 a cada pinta de sangre comprada en los Estados Unidos; que estipularon la cantidad de 7,665 pintas de sangre importadas durante el periodo de restauración, del 20 de septiembre de 2017 al 31 de enero de 2018.

Asimismo, el foro juzgador particularizó que, tanto en la fase de ajuste como a través del litigio, el Banco de Sangre representó que normalmente incurría en un costo de producción de $122.12 por cada pinta de sangre donada localmente en Puerto Rico. Añadió que el Banco de Sangre también había representado que, a diferencia de la donada, una pinta de sangre importada ya estaba lista para transfundirse y, por tanto, no incurría en los referidos costos de producción relacionados a la colección y procesamiento de la sangre donada. Ante ello, determinó que la prueba documental fue contundente y demostró que, independientemente del costo atribuible a nómina, el Banco de Sangre no incurrió en dicho costo respecto a las pintas de sangre que importó. Resolvió que, aun de haber incurrido en un costo de nómina en cuanto a las pintas de sangre importadas, la nómina era un gasto operacional normal del negocio que continuó y, por tal razón, era un factor totalmente ajeno a la cuantificación del *Extra Expense*. Sobre ese particular, expresó lo siguiente:

> Resulta evidente que[,] al ajustar la pérdida de *Extra Expense* aquí en disputa, Universal tomó como cierta la información que le proveyó el Banco [de Sangre] (al igual que hicieron los peritos contratados para propósitos del litigio) e identificó la cantidad del gasto por pinta de sangre importada que excedió el nivel normal de ese gasto particular que se habría incurrido durante el periodo de restauración[,] de no haber ocurrido el Huracán María[,] y del gasto necesario para reducir la pérdida de ingresos del negocio: $186.00 – $122.12 = $63.88. Tomó la diferencia de $63.88 y la multiplicó por las 7,665 pintas de sangre importadas hasta el 31 de enero de 2018. Necesariamente, Universal tuvo que descontar el costo de producción ($122.12) no incurrido en cuanto a las pintas importadas porque, como hemos

mencionado, hubiese constituido una ganancia indebida, no compensable bajo la [P]óliza.[17]

El foro sentenciador resaltó que el Banco de Sangre vendió todas las pintas que importó durante la emergencia y, conforme a la documentación financiera que produjo, mitigó su pérdida de ingresos, como era su obligación bajo la Póliza. Indicó que se había comprobado que el Banco de Sangre devengaba una ganancia de $83.10 en las pintas donadas que se vendieron a un promedio de $205.22 en ese periodo, mientras que la venta de pintas importadas resultaba en un total de $19.22. Al comparar ambas cantidades, concluyó que del total de $186.00 pagado por pinta importada, el *Extra Expense* en que incurrió el Banco de Sangre por pinta era la reducción de su ganancia de $83.10 a $19.22, dejando un saldo de $63.88 por pinta por compensarle Universal al Banco de Sangre. Por tanto, determinó que 7,665 por $63.88 fue el *Extra Expense* del Banco de Sangre en las pintas importadas de los Estados Unidos.

Asimismo, el foro apelado señaló que, con el pago de $490,253.00 que Universal realizó, logró poner al Banco de Sangre en la misma posición en la que hubiese estado de no haber azotado el huracán María. Según coligió, la prueba presentada por el Banco de Sangre no estableció que Universal le debía cantidad adicional alguna a la ya pagada. En vista de ello, declaró No Ha Lugar la causa de acción sobre incumplimiento contractual.

Por otro lado, en cuanto a la acción de daños y perjuicios, el Tribunal de Primera Instancia concluyó que Universal actuó de conformidad con los términos de la Póliza y las disposiciones vigentes del Código de Seguros, *supra*. Indicó que el Banco de Sangre no presentó prueba suficiente para establecer que Universal tuvo la voluntad de incumplir con sus obligaciones o que la investigación que realizó fuera deficiente. A la luz de todo lo anterior,

---

[17] Apéndice del recurso, pág. 1898.

y ante la falta de prueba de daños por incumplimiento contractual, el foro primario declaró No Ha Lugar la referida causa de acción y desestimó el reclamo de intereses.

Por último, sobre la solicitud de honorarios de abogado(a) por temeridad, el foro de instancia señaló que el expediente estaba huérfano de prueba que demostrara que Universal procedió temerariamente por haber incurrido en una o varias de las citadas causas de acción al litigar el presente caso. Ante la ausencia de una determinación de temeridad por parte de Universal, resolvió que no procedían los honorarios de abogado(a) ni la imposición de intereses pre-sentencia.

En desacuerdo, el 16 de agosto de 2024, el Banco de Sangre presentó una *Moción de Reconsideración*,[18] a la cual Universal se opuso el 16 de septiembre del mismo año.[19] Atendidos los planteamientos de las partes, el día siguiente, el foro *a quo* declaró No Ha Lugar la solicitud de reconsideración.[20]

Inconforme, el 17 de octubre de 2024, la parte apelante acudió ante esta Curia mediante el recurso de epígrafe y señaló los siguientes errores:

> Erró manifiestamente el TPI al ignorar que la cláusula de "*Loss Determination*" de la póliza solo permite dos (2) deducciones al monto de gastos extra: (A) el valor de salvamento de propiedad comprada para uso temporero, y (B) cualquier monto de gastos extra pagado bajo otro contrato de seguro.

> Erró el TPI al determinar que Universal actuó correctamente al deducir del monto de gastos extra por compra de sangre, el gasto de producción que, a su entender, el Banco de Sangre ahorró al importar sangre.

> Erró el TPI al no interpretar la cláusula de "*Loss Determination*" a favor del asegurado, el Banco de Sangre, lo cual contraviene la regla hermenéutica *contra proferentem*, dado a que existen dos interpretaciones razonables de la mencionada disposición.

---

[18] Apéndice del recurso, págs. 1905-1915.
[19] Íd., págs. 1919-1929.
[20] Íd., pág. 1930.

En cumplimiento con nuestra *Resolución* del 21 de octubre de 2024, y luego de concedida una prórroga a esos efectos, la parte apelada compareció mediante *Alegato en Oposición a Apelación* el 9 de diciembre del mismo año.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

**II**

El negocio de seguros se encuentra revestido de un alto interés público por el rol vital que juega esa industria en la sociedad y economía. *Carrasquillo Pérez et al. v. Asociación y/o Consejo de Titulares del Condominio Parque 352 et al.*, 2024 TSPR 101, resuelto el 16 de septiembre de 2024; *W.M.M., P.F.M. et al. v. Colegio et al.*, 211 DPR 871 (2023); *OCS v. Universal*, 187 DPR 164, 174 (2012). El contrato de seguros es uno mediante el cual una persona se obliga a indemnizar a otra, pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en la obligación. *Íd.*; Art. 1.020 del Código de Seguros de Puerto Rico, 26 LPRA sec. 102. En este tipo de contrato, la parte asegurada transfiere el riesgo a la compañía aseguradora a cambio de una prima y surge una obligación por parte de esta de responder por los daños económicos que sufra la asegurada en caso de ocurrir el evento específico. *Barreto Nieves et al. v. East Coast*, 2024 TSPR 40, 213 DPR ___ (2024); *Coop. Ahorro y Créd. Oriental v. S.L.G.*, 158 DPR 714, 721 (2003).

El Código de Seguros de Puerto Rico, Ley Núm. 77 de 19 de junio de 1957, según enmendada, 26 LPRA sec. 101 *et seq.* (Código de Seguros), regula las prácticas comerciales de esta industria. *Rivera Candela y otra v. Universal Insurance Company*, 2024 TSPR 99, resuelto el 11 de septiembre de 2024; *W.M.M., P.F.M. et al. v. Colegio et al.*, supra. En particular, el Artículo 11.140 del Código de Seguros, 26 LPRA sec. 1114, dispone que la póliza es el instrumento

donde se deja por escrito un contrato de seguros y se articulan los riesgos que cubre el seguro, las exclusiones y todas las condiciones de este. Al determinar cuáles son los riesgos cubiertos por un seguro, es necesario considerar si en el contrato figura alguna "cláusula de exclusión". Estas cláusulas tienen el propósito de limitar la cubierta establecida en el acuerdo principal y disponen que la parte aseguradora no responderá por determinados eventos, riesgos o peligros. *Monteagudo Pérez v. E.L.A.,* 172 DPR 12, 21 (2007). Para interpretar esas cláusulas y el contrato de seguros en general, el Artículo 11.250 del Código de Seguros, 26 LPRA sec. 1125, expone lo siguiente:

> Todo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de [e]sta. Véase, *Carrasquillo Pérez et al. v. Asociación y/o Consejo de Titulares del Condominio Parque 352 et al.*, supra; *Barreto Nieves et al. v. East Coast*, supra.

La jurisprudencia considera el contrato de seguro como uno de adhesión, ya que es la parte aseguradora quien redacta la póliza conforme a sus intereses sin la intervención directa de la parte asegurada. *Serrano Picón v. Multinational Life Ins.*, 212 DPR 981 (2023); *Quiñones López v. Manzano Pozas*, 141 DPR 139, 155 (1996). En vista de la naturaleza de este tipo de contrato, la parte aseguradora tiene la obligación de establecer en la póliza, de forma clara, los riesgos por los que está obligada a responder. *Meléndez Piñero v. Levitt Sons of P.R.,* 129 DPR 521, 547 (1991). Por lo tanto, las normas de interpretación general de los contratos recogidas en el Código Civil de Puerto Rico aplicarán únicamente de forma supletoria. *Barreto Nieves et al. v. East Coast*, supra.

Igualmente, el Tribunal Supremo de Puerto Rico adoptó como regla general la interpretación liberal a favor de la parte asegurada en este tipo de contrato. *Aparicio v. Asoc. de Maestros*, 73 DPR 596

(1952). En *Quiñones López* v. *Manzano Pozas*, supra, pág. 155, nuestro más Alto Foro explicó este principio de la siguiente forma:

> [E]n caso de dudas en la interpretación de una póliza, [e]sta debe resolverse de modo que se realice el propósito de la misma: proveer protección [a la parte] asegurad[a]. Es por eso que no se favorecerán las interpretaciones sutiles que le permitan a las compañías aseguradoras evadir su responsabilidad. Corresponde a los tribunales buscar el sentido y significado que a las palabras de la póliza en controversia le daría una persona normal de inteligencia promedio que fuese a comprar la misma.

**No obstante, este principio de interpretación no tiene el efecto de obligar a los tribunales a decidir a favor de la parte asegurada una cláusula que claramente le da la razón a la aseguradora cuando su significado y alcance sea claro y libre de ambigüedad**. *López v. Atlantic Southern Ins. Co.*, 158 DPR 562, 569 (2003). Al ser el contrato de seguro uno de adhesión, si sus cláusulas están libres de ambigüedad y son claras en cuanto a su significado y alcance serán obligatorias y constituirán ley entre las partes. *Carrasquillo Pérez et al. v. Asociación y/o Consejo de Titulares del Condominio Parque 352 et al.*, supra; *S.L.G. Francis-Acevedo v. SIMED*, 176 DPR 372, 387 (2009); *TOLIC v. Febles Gordián*, 170 DPR 804, 812 (2007). Los términos de una póliza se reputarán claros cuando su lenguaje sea específico, cuando no dé lugar a dudas o cuando no sea susceptible a distintas interpretaciones. *Íd.* A su vez, "los términos de las pólizas de seguro deben ser generalmente entendidos en su más corriente y usual significado, sin atender demasiado al rigor gramatical, sino al uso general y popular de las voces". *Íd.*, citando a *Echandi Otero v. Stewart Title*, 174 DPR 355, 370 (2008).

Esbozada la norma jurídica, procedemos a aplicarla al recurso antes nos.

**III**

La parte apelante sostiene que el Tribunal de Primera Instancia incidió al ignorar que la cláusula de *Loss Determination* de la Póliza solo permite dos (2) deducciones al monto de gastos extra: (A) el valor de salvamento de propiedad comprada para uso temporero, y (B) cualquier monto de gastos extra pagado bajo otro contrato de seguro. Como segundo señalamiento de error, plantea que el foro primario erró al determinar que Universal actuó correctamente al deducir del monto de gastos extra por compra de sangre, el gasto de producción que, a su entender, el Banco de Sangre ahorró al importar sangre de los Estados Unidos. Por último, alega en su tercer señalamiento de error que el foro *a quo* incidió al no interpretar la cláusula de *Loss Determination* a su favor como parte asegurada, lo cual contraviene la regla hermenéutica *contra proferentem*, dado a que existen dos interpretaciones razonables de la mencionada disposición. Por estar relacionados entre sí, discutiremos los errores en conjunto.

Al examinar cuidadosamente el expediente, resulta evidente que este Tribunal revisor tiene ante su haber una controversia estrictamente de Derecho. En ese sentido, debemos determinar si procedía la deducción del gasto de producción no incurrido por el Banco de Sangre en cuanto a las pintas importadas de los Estados Unidos, conforme a la interpretación a favor de la parte asegurada de la cláusula *Loss Determination*, específicamente sobre la cubierta del *Extra Expense*. Veamos.

Según esbozado, la póliza es el documento en el que se exponen por escrito los términos que rigen el contrato de seguro. *W.M.M., P.F.M. et al. v. Colegio et al.*, supra, pág. 885. Según las normas de hermenéutica pautadas en el Código de Seguros, *supra*, las cláusulas contenidas en una póliza deben interpretarse de manera global, es decir, a base del conjunto total de los términos

según consignados, ampliados, extendidos o modificados mediante aditamento, endoso o solicitud adherida a la póliza. 26 LPRA sec. 1125. Al analizar los términos del acuerdo, los tribunales deben buscar su sentido o significado desde la óptica de un ciudadano de inteligencia promedio interesado en adquirir la póliza. *W.M.M., P.F.M. et al. v. Colegio et al.*, supra, págs. 885-886.

Asimismo, los términos de los contratos de seguro se rigen por las normas de interpretación aplicables a los contratos en general. *Íd.*, pág. 886, citando a *San Luis Center Apts. et al. v. Triple-S,* 208 DPR 824, 832 (2022). En consecuencia, el lenguaje establecido en la póliza debe ser interpretado en su acepción de uso común general, sin ceñirse demasiado al rigor gramatical. *Rivera Matos et al. v. Triple-S et al.,* 204 DPR 1010, 1020 (2020). Ello permite que las personas que adquieran una póliza puedan conocer fácilmente el alcance de la cubierta que se les ofrece. *Íd.*

Sabido es que, debido a que el contrato de seguro es un contrato de adhesión, las cláusulas dudosas o ambiguas deberán interpretarse liberalmente en beneficio de la parte asegurada. *W.M.M., P.F.M. et al. v. Colegio et al.*, supra. No obstante, dicho principio de hermenéutica no aplicará cuando las cláusulas en cuestión resulten claras y libres de ambigüedad. *Íd.* En ese sentido, los términos del contrato de seguro se consideran claros cuando su lenguaje es específico y no está sujeto a dudas o diferentes interpretaciones. *San Luis Center Apts. et al. v. Triple-S,* supra. Por lo tanto, ante la ausencia de ambigüedad en las cláusulas del contrato, estas son obligatorias y su contenido constituye la ley entre las partes. *Íd.*

En el caso de autos, está en controversia la cláusula de *Extra Expense* y *Loss Determination* contenidas en el formulario CP 00 30 10 12 de la Póliza que nos ocupa, intitulado *Business Income (and*

*Extra Expense) Coverage Form.* [21] En particular, los gastos adicionales (*extra expenses*) se definen en la Póliza como "necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss."[22]

Por otro lado, conforme dispone la cláusula de *Loss Determination*, la cantidad del *Extra Expense* se determinará a base de:

> (1) All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:
>
> > (a) The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and
> >
> > (b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions[,] and provisions as this insurance; and
>
> (2) Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.[23]

En apoyo a su contención, la parte apelante sostiene que la precitada cláusula no fue interpretada a su favor. Especifica que la cláusula de *Loss Determination* solo permite dos deducciones al realizar el cálculo de *Extra Expense,* pero ninguna de esas circunstancias está presente en el caso de autos. Argumenta que lo que procede es calcular el total gastado en la compra de las pintas de sangre importadas de los Estados Unidos. Es decir, sostiene que el cálculo correcto de sus gastos adicionales (*extra expenses*) por la compra de sangre en los Estados Unidos es 7,665 pintas por $186.00 del costo por importe, para un total de $1,425,690.00, que es la cantidad que reclama.

---

[21] Apéndice del recurso, págs. 526-765.
[22] Íd., pág. 575.
[23] Íd., pág. 580.

Por su parte, el apelado plantea que procede descontar el costo de producción no incurrido por el Banco de Sangre a la cantidad total de la pinta importada de los Estados Unidos. Arguye que los $122.12, por el costo de producir una pinta de sangre donada en Puerto Rico, que el apelante pretende recobrar constituiría una ganancia indebida, ya que no representa un gasto adicional según definido en la precitada cláusula de la Póliza.

Hemos examinado ponderadamente la Póliza en cuestión, el derecho aplicable y su jurisprudencia interpretativa, y concluimos que el Tribunal de Primera Instancia no erró en su determinación. Nos explicamos.

De una lectura del *Loss Determination*, tomando en consideración el significado de *Extra Expense*, al interpretarlo de una forma global y a favor de la parte asegurada, no albergamos duda de que, contrario a lo propuesto por el apelante, la cláusula es clara, está libre de ambigüedades y no admite más de una interpretación. Ante ello, colegimos que la cantidad del gasto adicional que la aseguradora (Universal) viene obligada a indemnizar se determina a base del exceso en gastos normales que, por el paso del huracán María, el asegurado (Banco de Sangre) tuvo que incurrir y del gasto necesario para reducir la pérdida de ingresos del negocio. En otras palabras, el monto cubierto por la referida Póliza que el Banco de Sangre puede recobrar es la cantidad que pagó en exceso de lo que costaba producir el mismo producto durante la operación normal de su negocio. Es decir, la cantidad del gasto por pinta de sangre importada de los Estados Unidos que excedió el nivel normal de ese gasto particular que se habría incurrido durante el periodo de restauración, de no haber ocurrido un suceso como lo fue el huracán María, y del gasto necesario para reducir la pérdida de ingresos del negocio. Recordemos que el principio de interpretación a favor de la parte asegurada no tiene el efecto de obligar a los

tribunales a decidir a favor de esta cuando el alcance de una cláusula es claro y libre de ambigüedades.

Conforme a lo anterior y según las determinaciones de hechos esbozadas por el foro juzgador, las cuales merecen nuestra deferencia y damos por buenas, el costo de la pinta de sangre –ya procesada– importada de los Estados Unidos es $186.00, menos $122.12 que es el costo de producción que hubiera incurrido el Banco de Sangre si esta hubiera sido donada en la Isla, lo que representa un total de $63.88. Ello, es multiplicado por las 7,665 pintas de sangre importadas hasta el 31 de enero de 2018, para un total de $489,640.20. Surge del expediente que Universal realizó un pago de $490,253.00 al Banco de Sangre, correspondiente al ajuste y oferta de la reclamación de gastos adicionales por la compra de sangre importada, cumpliendo así con su obligación estatuaria, conforme a la correcta interpretación de la cláusula de *Loss Determination* aquí impugnada. Por consiguiente, los errores señalados no se cometieron.

En virtud de lo anterior, colegimos que el foro de origen no erró al emitir la *Sentencia* apelada declarando No Ha Lugar la acción de epígrafe. Al analizar concienzuda y ponderadamente el expediente ante nos al palio de la normativa jurídica antes esbozada, coincidimos con la determinación del foro primario.

**IV**

Por las razones que anteceden, confirmamos el dictamen apelado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones